**Cheryl CLAY, Assessor for Tulsa County, Oklahoma, Appellee,**

v.

**INDEPENDENT SCHOOL DISTRICT NO. 1 OF TULSA COUNTY, Oklahoma; Clyde Moore, Cathy Newsom, Walter D. Hushbeck, Nancy Allen, Judy Eason–McIntyre, Doug Dodd and Dale Ellis, Members of Independent School District No. 1 of Tulsa County, Oklahoma; Independent School District No. 5 of Tulsa County, Oklahoma; Mike Francisco, Ben Maples, Billie Mills, Don Chalmers and Terry Almon, Members of Independent School District No. 5 of Tulsa County, Oklahoma; and Independent School District No. 11 of Tulsa County, Oklahoma; J.B. Stigal, Larry Kornegay, Dale Orr, Claude Marshall and Marilyn Hinkle, Members of Independent School District No. 11, Appellants.**

No. 81882.

Supreme Court of Oklahoma.

Feb. 18, 1997.

---

David L. Fist, J. Douglas Mann, Jerry A. Richardson, Rosenstein, Fist & Ringold, Tulsa, for Appellants.

David Moss, Tulsa County District Attorney, J. Dennis Semler, Assistant District Attorney, Tulsa, for Appellee.

John B. Turner, Rebecca M. Fowler, Doerner, Stuart, Saunders, Daniel, Anderson & Biolchini, Tulsa, for Amicus Curiae Public Service Company of Oklahoma.

Roger K. Toppins, Oklahoma City, for Amicus Curiae Southwestern Bell Telephone Company.

Deborah B. Barnes, Tulsa, for Amicus Curiae Transok, Inc.

SUMMERS, Justice.

A recently enacted statute requires the County Assessor to visually inspect and revalue real property for ad valorem taxation purposes. It provides for apportionment of the Assessor's revaluation costs among the local recipients of the tax revenues. The defendants are three Tulsa County school districts who have not paid their share of the Assessor's revaluation expense. The plaintiff is the Tulsa County Assessor, who wants them to do so. Must the school districts pay the Assessor, and if so what are the procedures the Assessor must use to get paid? We conclude that (1) the Assessor may use mandamus during the fiscal year to obtain payment from that year's school budget, and (2) if the Assessor's claims come after the end of the fiscal year the Assessor may get a judgment payable from the school's sinking fund when the revaluation expense was included in the school district's budget, and when the judgment complies with the Oklahoma Constitution and statutes for judgments against school districts. For reasons to be explained our holding is prospective in part.

The case was tried in the District Court of Tulsa County. The result was that the trial

court by way of mandamus ordered the school districts to pay their share. They appealed and the Court of Appeals affirmed. We have granted certiorari to resolve this matter of broad public concern.

## I.

The statutes requiring the Assessor to conduct a program for the visual inspection of taxable real property in the county for the purpose of ad valorem taxes are 68 O.S.1991 §§ 2820, 2821. The annual budget of the Assessor's office is submitted to the County Excise Board (or County Budget Board), and that board must make adequate provision for the costs of the inspection program. 68 O.S.Supp.1992 § 2822. The Assessor's cost of this inspection program is apportioned among the various recipients of revenues from the mill rates levied, including the county, all cities and towns, all school districts, and all sinking funds of such recipients. 68 O.S.Supp.1992 § 2823(B). The Assessor renders a statement to each of the jurisdictions, including school districts, that are required to pay their proportionate cost. That statement must include "The current fiscal year in which the charge has been incorporated in the jurisdiction's budget." 68 O.S.Supp.1992 § 2823(D)(1).

The school districts seek to have the payments of the revaluation expense come from the sinking fund. The definition of a sinking fund is provided by 62 O.S.1991 § 331:

> Fourth. All funds required to be provided by ad valorem tax levy to pay outstanding indebtedness created under authority of Section 26 and/or Section 27, Article 10, Constitution, are hereby declared to constitute the "Sinking Fund" of

such county or other municipal subdivision, to be used for the payment of coupons, bonds, and judgments as provided by law. Additionally, the sinking fund of a district "shall consist of all money derived from ad valorem taxes or otherwise as provided by law for the payment of bonds and judgments and interest thereon." 70 O.S.1991 § 1–119.

■ For a school district to budget the revaluation cost to a sinking fund that cost must qualify as an outstanding indebtedness created under authority of Sections 26 and/or 27 of Article 10 of the Constitution, or to pay judgments, bonds, or interest thereon. Clearly, § 26 does not include the Assessor's revaluation costs, since indebtedness created by § 26 requires a vote of the people for that purpose, and payment of the revaluation costs is not made by such an election.[1] The same may be said for § 27 indebtedness created by a vote of the people at an election held for that purpose.[2]

Sinking funds are used to pay coupons, bonds, and judgments. 62 O.S.1991 § 331; 70 O.S.1991 § 1–119. The revaluation payment is not a coupon or bond.[3] Neither is the revaluation payment a judgment, since a judgment is the final determination of the rights of the parties in an action. 12 O.S. 1991 § 681. In sum, a school district's payment to the assessor for that district's share of the revaluation expense is not of one of the statutorily allowed charges against a sinking fund, and cannot be included in the district's budget as a charge against a sinking fund.

The school districts argue that the revaluation payments need not be budgeted and paid from the general funds of the districts as annual expenses. They contend that the unbudgeted payments may be paid from sink-

---

1. Section 26 begins with the following: "Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, . . . ." The two versions of § 26 in effect during the fiscal year at issue contain this language.

2. Section 27 begins with the following: "Any incorporated city or town in this State may, by a majority of the qualified property tax paying voters of such city or town, voting at an election held for that purpose, be allowed to become indebted . . . ."

3. See *City of Lawton v. West,* 33 Okla. 395, 126 P. 574, 575 (1912), (defining bond); 62 O.S.1991 § 591 (defining coupon bond); 62 O.S.1991 § 399 (coupon represents interest due on a bond); and 2 L. Jones, *Bonds and Bond Securities,* §§ 602, 715 (discussing coupon as evidence to demand payment of interest on a bond).

ing funds if the districts allow judgments to be taken against the districts in the amounts of the payments. We disagree.

The statutory scheme indicates that school districts pay the revaluation expenses for a current fiscal year during that fiscal year. The revaluation expense for a particular year is incorporated into the budget of the school district for that year. 68 O.S.Supp.1992 § 2823(D)(1). When a jurisdiction's budget and mill rate is not approved by a county Excise Board the billing statement does not conform to § 2823(D)(1), but must instead expressly state that the payments are "due and payable by December 31 of the current fiscal year." Additionally, the statute states that the Assessor's current year charges for the revaluation payments should equal the total visual inspection program's budget for the current fiscal year. *Id.* at § 2823(D)(3).

We have explained that our State Constitution requires school districts "to carry on their operations upon a cash, or pay as you go plan." *School Dist. No. 2 v. Gossett,* 140 Okla. 243, 283 P. 249, 252 (1929); *Gentis v. Hunt,* 121 Okla. 71, 247 P. 358 (1925). The school districts argue for a scheme where the school districts' payments for a current fiscal year are shifted to payments on judgments in subsequent years.[4] This would have the effect of shifting the Assessor's funds to oper-

ate a current and annual revaluation program to a funding mechanism of more than one year in duration. Such a result contravenes both statute and the Oklahoma Constitution as to the operation of both the school districts and the Assessor's office.

## II.

Our Constitution states that political subdivisions of the State must operate on a cash basis to prevent indebtedness extending beyond one year, unless the public has authorized the debt by an election held for that purpose. *City of Del City v. Fraternal Order of Police, Lodge No. 114,* 869 P.2d 309, 311 (Okla.1994). This provision applies to both school districts and a county assessor.[5]

In determining whether a particular obligation is a "debt" within the scope of § 26 this Court has looked to the nature of the obligation and the remedy to enforce the obligation.[6] A statutory obligation allocating financial obligations between government entities is one that has historically been treated as one in assumpsit, or contract. Judicial enforcement of a statutory obligation capable of being reduced to certainty was by an action in assumpsit, i.e., contract, and the obligation was referred to as quasi-contractu-

---

4. A money judgment may be paid in one fiscal year if surplus funds are available. 62 O.S.1991 § 365.6. However the levy and tax to pay a judgment begins with payment of one-third of the judgment. A money judgment against a school district "shall be paid in the following manner, and may be paid in no other manner" in accordance with 62 O.S.1991 § 365.5. The judgment is spread on a budget for levy as to the first third of the judgment. *Id.* The levy to pay the judgment is equal to one-third of the amount of the original judgment when one-third of that amount remains due and unpaid. 62 O.S.1991 §§ 431, 435. See *Excise Board of Grady County v. Griggs,* 192 Okla. 636, 138 P.2d 829, 831 (1943), (judgment creditor entitled to have a tax levied for one-third of the judgment each year until it is paid in full); *Board of Education of City of Drumright v. Board of Commissioners of Creek County,* 171 Okla. 464, 43 P.2d 139 (1935), (court explained right of judgment creditor to payment of one-third each year based upon O.S.1931 §§ 5913, 5919, now codified at 62 O.S.1991 §§ 431, 435).

5. The constitutional provision begins with the language: "Except as otherwise herein provided, no county, ... school district ... shall be al-

lowed to become indebted...." Okla. Const Art. 10 § 26.

6. Our jurisprudence in this area has included opinions discussing whether a particular item was a debt, or a tax, or a special assessment. For example, in *Wilson v. City of Hollis,* 193 Okla. 241, 142 P.2d 633 (1943), the court overruled a holding in a prior opinion and held that the item at issue was a special assessment and a debt rather than a tax. This allowed a bondholder to convert the debt into a judgment with payment from a sinking fund, provided that the bondholder complied with those statutes on judgments against a sinking fund and Okla. Const. Art. 10 § 28. *Id.* 142 P.2d at 640. A tax is not converted into a judgment and paid from sinking funds, but is enforced in the manner provided by statute for the tax. See *Independent School Dist. v. Exchange Nat. Co.,* 164 Okla. 176, 23 P.2d 210, 211 (1933), *overruled in part,* in *Wilson v. City of Hollis, supra.* For a discussion of taxes versus special assessments see *Blythe v. City of Tulsa,* 172 Okla. 586, 46 P.2d 310, 312–313 (1935).

al.[7] Judicial enforcement of the quasi-contractual statutory obligation via an action in assumpsit (contract) between two governmental entities was commonplace in two states as early as 1817, and a legislative intragovernmental allocation of funding has been both judicially and legislatively recognized in other contexts in this State.[8] Our conclusion to treat the statutory revaluation obligation as remedied via quasi-contract is in accord with the rich legal tradition of enforcing fiscal statutory duties by way of quasi-contract.[9]

▮ The duty to pay the revaluation expense is quasi-contractual. A quasi-contractual obligation is one where the remedy is the same as where the obligation is contractual. *Shebester v. Triple Crown Insur-*

7. Not every breach of a statute gave rise to an action in quasi-contract. For example, a breach of a statute resulting in false imprisonment could result in an action in trespass, while an action of debt would lie when the statute required payment in an amount capable of being reduced to a certainty, as opposed to unliquidated damages. *Bullard v. Bell*, 1 Mason 243, 4 Fed.Cas. 624, 639–640 (1817). Assumpsit was, of course, an action based upon certain types of contracts. *Welborn v. Dixon*, 70 S.C. 108, 49 S.E. 232, 235 (1904). The statutory obligation enforced by assumpsit came to be labeled as a quasi-contract. Ames, *The History of Assumpsit*, 2 Harv.L.Rev. 1, 63–69 (1888). In other words, a quasi-contract was where the obligation was imposed by law, and the obligation was enforced using the action for breach of contract. *Shebester v. Triple Crown Insurers*, 826 P.2d 603, 610 (Okla.1992). For example, see *Steamship Co. v. Joliffe*, 69 U.S. (2 Wall.) 450, 457, 17 L.Ed. 805 (1864) where that Court noted that a statutory obligation to pay pilotage fees created an obligation in quasi-contract.

8. See *Bullard v. Bell*, 1 Mason 243, 4 Fed.Cas. 624, 640 (1817), where Justice Story explained that it was common practice in New Hampshire and Massachusetts for towns to use assumpsit in adjudicating statutorily based fiscal responsibility for paupers. In *State ex rel. Blankenship v. Atoka County*, 456 P.2d 537 (Okla.1969), we explained that using ad valorem tax revenues to pay a portion of the salary of an assistant district attorney did not violate Okla. Const. Art. 10 § 9, because a benefit to the county was secured thereby. *Id.* 456 P.2d at 540–541. Another example of legislatively approved cost allocation between government entities is 70 O.S.1991 § 5–114 where the excise board apportions the costs of the services of the county treasurer among those districts using the services of the treasurer.

9. In addition to cases such as *Bullard v. Bell supra*, at n. 8, the quasi-contractual remedy is a concept that has historical roots in cases giving a governmental entity a quasi-contract action against those failing to perform their statutory duties, and those cases concluding that a violation of a statutory duty may be the basis of an action in quasi-contract. "The Supreme Court has held that a defendant has a quasi-contractual obligation to reimburse the government when it incurs costs in discharging a duty the defendant would not perform." *U.S. v. P/B STCO*, 756 F.2d

364, 371 (5th Cir.1985), citing, *Metropolitan Railroad Co. v. District of Columbia*, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889). That Circuit Court then explained *Wyandotte Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), where a vessel owner failed to fulfill its statutory duty to remove a sunken vessel, the government effectuated its removal, and thereafter brought an action to recover the cost of removal. The Circuit Court explained that *Wyandotte* had been interpreted as an application of traditional quasi-contractual principles found in the Restatement of Restitution. 756 F.2d at 374. Courts have long recognized that a statutory duty could be the basis of a quasi-contract action. For example, in *Augner v. Mayor, et al. Of the City of New York*, 14 App.Div. 461, 26 N.Y.Civ.Pro.Rep. 165, 43 N.Y.S. 803 (1897) although the majority and dissent differed on the application of a statute, they agreed that the action was quasi-contractual. 26 N.Y.Civ.Pro. Rep. at 169, 171, 43 N.Y.S. 803. The dissent by Barrett, J., explained: "This action is upon what has been aptly termed a *quasi* contract. It is not upon a genuine contract, that is, an agreement in fact between plaintiff and defendant, either express, or implied; it is simply upon a statutory liability, which is sufficient to sustain an action analogous to what was formerly called *assumpsit*." at 171, 43 N.Y.S. 803. In *Inhabitants of Milford v. Commonwealth*, 144 Mass. 64, 10 N.E. 516 (1887) suit was brought by the town against the Commonwealth for the recovery of expenses incurred in the support of a state pauper. The court described the action: "... actions under statutes to recover for money expended have usually been actions of contract.... The law regards the money as expended at the implied request of the defendant, and a promise to pay the money is said to be implied from the liability created by the statute.... a contract is sometimes said to be implied when there is no intention to create a contract, and no agreement of parties, but the law has imposed an obligation which is enforced as if it were an obligation arising *ex contractu*. In such a case, there is not a contract, and the obligation arises *ex lege*." *Id.* at 65, 10 N.E. 516. The recovery of statutory fees has also been by an action in quasi-contract. See *Steamship Co. v. Joliffe, supra* at n. 7 and *Harris v. Christian*, 10 Pa. 233 (1849), (fees statutorily required to be paid to magistrate did not create a contract, but an implied promise).

*ers,* 826 P.2d 603, 610 (Okla.1992). The remedies of mandamus and a civil judgment paid from the sinking fund used to enforce the revaluation payment as explained in part III herein are the same as those used to enforce contractual obligations of a school district. By treating the quasi-contractual revaluation obligation as contractual in nature the question arises as to the applicability of 62 O.S. 1991 §§ 361–363.[10]

> Before final judgment in any suit based on contract shall be rendered against any municipality by any court of any county in the State of Oklahoma, ... proof shall be made to the court of the existence, character and amount of outstanding legal indebtedness of said municipality, which proof shall include ...
>
> 3. An itemized statement of the indebtedness proposed to be converted into a judgment, so classified as to show, in separate exhibits, all items of questionable legality, if any, and the reasons of said officer or officers therefor:

> (a.) The appropriations against which each warrant was drawn or claim accrued if in judgment, and if within the limits purposes thereof as provided by law; 62 O.S.1991 § 362

> No judgment shall be rendered against any municipality by any court until the provisions of Section 2 hereof, have been fully complied with. Any judgment rendered in violation of the provisions of this act shall be void and of no effect. 62 O.S.1991 § 363.

There are, to be sure, some quasi-contractual obligations of a governmental entity not subject to the provisions of 62 O.S.1991 §§ 361–363 for the purpose of a sinking fund judgment i.e., they are not treated as contractual obligations.[11] However, application of §§ 361–362 to a judgment against a school district for this expense, whether labeled as "mandamus" or "judgment," is consistent with how this court has viewed the efforts of parties in bringing actions in mandamus in attempts to avoid statutory limitations on judgments or process.[12] Additionally, appli-

---

10. Generally, an action in quasi-contract is provided with the same remedy as in contract. *Shebester v. Triple Crown Insurers, supra.* This is shown in *T & S Investment Company v. Coury,* 593 P.2d 503 (Okla.1979) where we explained in applying a statute of limitations for contracts that when an obligation is in quasi-contract the applicable statutory provisions for a remedy in contract apply. A judgment in an action in contract against a municipality, including a school district, is void if the judgment does not comply with § 362. *Valley Vista Development Corp., Inc. v. City of Broken Arrow,* 766 P.2d 344, 348 (1988); *Dodd, Mead & Co. v. Union Graded School Dist. No. 1,* 165 Okla. 225, 25 P.2d 797, 799 (1933). When a judgment must comply with § 362, and it does not, the flaw is jurisdictional. *Baylis v. City of Tulsa,* 780 P.2d 686, 687–688 (Okla.1989). This court examines jurisdictional flaws occurring on the face of the record. *Lincoln Bank and Trust v. Oklahoma Tax Commission,* 827 P.2d 1314, 1318 (Okla.1992); *Hall v. Edge,* 782 P.2d 122, 124 (Okla.1989); *Cate v. Archon Oil Co.,* 695 P.2d 1352, 1356 (Okla.1985).

11. This is shown by the quasi-contractual obligations for refunding certain taxes. We have explained that an action for a tax refund is for money had and received. See *R.R. Tway, Inc. v. Oklahoma Tax Commission,* 910 P.2d 972, 979 n. 6 (Okla.1995). This action in quasi-contract was used by plaintiffs, under authority of O.S.1931 § 12749, when seeking the recovery of money spent for the purchase of illegal tax sale certifi-

cates. We explained that in such suits a plaintiff was not required to show the fact of an appropriation for the refund expense because the refund was not in the nature of a contract. *Board of County Commissioners of Creek County v. St. Louis–San Francisco Ry. Co.,* 170 Okla. 485, 40 P.2d 1112, 1113 (1935). This holding indicates that an action was not considered to be contractual for the purpose of 62 O.S. §§ 361–363 when a tax refund was sought. Thus, this statutory obligation to refund the illegal sales tax certificate funds via a quasi-contractual remedy was not treated as contractual for the purpose of §§ 361–363.

12. For example, in *Carter v. Collins,* 174 Okla. 4, 50 P.2d 203 (1935) the taxpayer brought an action in mandamus seeking a tax refund, and he claimed that the three-year statute of limitations on actions to enforce statutory liability did not apply. The court said: "We observe that although the action is designated as one in mandamus, and is in form mandamus, yet it is nothing more nor less than an action by Vernon Collins, the designated plaintiff, to enforce collection of his claim for a refund of the money involved." *Id.* 50 P.2d at 206. In concluding that the action was untimely the court said: "As we construe it, we are dealing here with a civil action for the recovery of money as a refund thereof, or to enforce payment of a claim for money, and regardless of its form, we hold it to be such a civil action as was intended to be barred by the provisions of section 101, O.S.1931 [12 O.S. § 95]."

cation of §§ 361–362 to a school district's revaluation obligation is consistent with how this Court has viewed statutorily imposed fiscal obligations of school districts.

Many obligations are imposed by law which require school districts to expend money on them. The fact that these obligations are imposed by law does not excuse a district from budgeting these items in the district's fiscal budget, and a judgment against a school district is not authorized against an unbudgeted expense of this nature.

For example, in 1928 school officials requested an appropriation for their budget to buy new buses. *Protest of Carter,* 148 Okla. 1, 296 P. 485 (1931). Their request was denied and they decided to acquire the buses without an appropriation. When the bus company filed a judicial action to compel payment the school district asked for a judgment to be rendered against it so that the buses could be paid from sinking funds. The school officials argued that the district bought the buses to fulfill a statutory duty of pupil transportation, and in the words of one of the officials "were asking for a judgment to pay for these trucks." *Id.* 296 P. at 489.

This Court explained that legislatively required expenditures for pupil transportation had to be pursuant to a "valid appropriation for that purpose." *Id.* In other words, fiscal year expenses of a subdivision of the State are to be paid from funds collected to pay fiscal year expenses, and not from other funds. Similarly, the legislatively required fiscal year revaluation expense paid by a school district must be pursuant to a valid appropriation for that purpose.

The view of the school districts is that an item required to be paid from an annual fiscal budget may remain unbudgeted and then paid from sinking funds in the form of a judgment. When an expense is to be paid from the ordinary tax revenues and those revenues are expended without payment of the expense, the resulting payment of the judgment from the sinking fund could result in an additional property tax levy on the citizens to pay the judgment. 62 O.S.Supp. 1994 § 365.5; 62 O.S.1991 §§ 431, 435; 68 O.S.1991 § 3017. The view of the school districts could result in a school funding practice whereby annual expense items are funded by an increase in taxes not voted upon by the people. This procedure was condemned in *Protest of Carter, supra,* and characterized in *Graves v. Board of County Commissioners of Cimarron County,* 170 Okla. 282, 39 P.2d 532, 533, 534 (1934) as a method penalizing taxpayers for the acts of public officials failing to perform their duties.

 We conclude that an Assessor attempting to obtain a money judgment against a school district to be paid by sinking funds must comply with 62 O.S.1991 §§ 361–363.[13] An Assessor must show in the District Court that an appropriation was made to the school district for the revaluation expense. 62 O.S. 1991 § 362. Because of the confusion in the District Court as to the proper remedy for this type of case we make our holding on this issue prospective beginning July 1, 1997, as we will explain in our Conclusion.

### III.

 The District Court issued a writ of mandamus to compel the immediate payment

---

*Id.* 50 P.2d at 210, explanatory cite added. See also the discussion in *Carter* explaining that "In the modern practice where a claimant resorts to the writ of mandamus to collect money due, as in the case at bar, we think the rule is and should be that in such case the action, though it be in form in mandamus, is barred after the time when an ordinary civil action to enforce the same or a similar right is barred by the statute." *Id.* at 207. The court then explained its earlier cases holding that mandamus used in place of an execution was limited to the same period of time that an execution would be limited to had the plaintiff used that form of process. *Id.*

**13.** This conclusion is consistent with 62 O.S. 1991 § 479 and its prohibition upon school dis-

trict officials allowing the district to become indebted in excess of the estimate made and approved by the excise board for the fiscal year. In *Graves v. Board of Commissioners of Cimarron County,* 170 Okla. 282, 39 P.2d 532 (1934), the Court relied upon O.S.1931 § 5955 where an action in contract was brought against a county to compel payment of printing expenses for the publication of tax lists. The publication was requested by the county treasurer and required by law. We explained that contractual obligations to pay money from public funds are void when they are in excess or in the absence of an appropriation therefor. *Id.* 39 P.2d at 534. See also 1996 Okla.Sess.Laws Ch. 178 § 9 (eff. July 1, 1996), (to be codified at 70 O.S. § 5–157) and its prohibition of authorizing any expenditure that exceeds the appropriation therefor.

of the revaluation expenses by the defendants. On appeal the parties discuss whether the District Court was correct in issuing the writ, and whether the District Court properly exercised review over the Excise Board.

The District Court attempted to exercise jurisdiction (1) as an appellate tribunal reviewing the Excise Board, and (2) on an application for a writ of mandamus by the Assessor. The former was improper but the latter was authorized. Neither Oklahoma's Administrative Procedures Act (75 O.S.1991 § 250.1 et seq.) nor 12 O.S.1991 § 951 provide a mechanism for District Court appellate review of the Excise Board in this case.

▇▇▇ The schools challenged the payments to be made to the Assessor by invoking their statutory right to appear before the Excise Board to provide "comments, information and documentation" concerning the budget submitted by the Assessor. 68 O.S.Supp.1992 § 2822(B). This statutory opportunity of a governmental entity to appear is not a tax protest, but merely an opportunity for one governmental entity to provide information to another acting in a legislative capacity in creating a budget. See *City of Ardmore v. Excise Bd. Of Carter County,* 200 Okla. 516, 197 P.2d 961, 964 (1948) where this Court explained that the Excise Board acts "in the capacity of a legislature" in apportioning taxes for purposes.

Section 951 provides for review of certain acts involving the exercise of a *judicial* function.[14] The legislative and discretionary determination as to the amount of the assessor's budget is not judicially reviewable pursuant to 12 O.S.1991 § 951. The O.A.P.A.,

75 O.S.1991 §§ 250.1 et seq., does not apply to counties or entities performing essentially local functions. 75 O.S.1991 § 250.5. The District Court could not exercise appellate jurisdiction over the Excise Board's decision on the Assessor's budget. That part of the District Court's order exercising appellate jurisdiction and affirming the Excise Board is reversed, as the District Court has no such jurisdiction.

▇▇▇ The proper remedy for an Assessor seeking payment during the fiscal year is by an application for mandamus in the District Court against the school districts, and when proper, against the Excise Board as well. When an Excise Board fixes appropriations for a school district at a lesser amount than it was its legal duty to do, the board may, during the fiscal year, correct the district's appropriations. *Lowden v. Caddo County Excise Bd.,* 176 Okla. 213, 55 P.2d 472, 474 (1936); *Greer County Excise Board v. Lowden,* 177 Okla. 7, 57 P.2d 612, 616 (1936). The Excise Board may make temporary appropriations for school boards, 68 O.S. 1991 § 3020, as well as supplemental and additional appropriations, 68 O.S.1991 § 3021; *Protest of Cities Service Gas Co.,* 162 Okla. 131, 19 P.2d 546 (1933). We recently explained this Excise Board procedure in *Morton v. Adair County Excise Board,* 780 P.2d 707, 710 (Okla.1989).

▇▇▇ During the fiscal year the Assessor may file an original action in the District Court for a writ of mandamus, and thereby compel the school board to include in its budget, and the Excise Board to approve, an appropriation for the revaluation expense.[15]

---

**14.** 12 O.S.1991 § 951 states:

A judgment rendered, or final order made, by any tribunal, board or officer exercising judicial functions, and inferior in jurisdiction to the district court, may be reversed, vacated or modified by the district court except where an appeal to some other court is provided by law.

**15.** See *Board of County Commissioners of Osage County v. Prentice,* 183 Okla. 542, 83 P.2d 557 (1938) where this Court affirmed a trial court writ that compelled county commissioners to request a supplemental appropriation from the excise board. *See also St. Louis–San Francisco Ry. Co. v. Craig County Excise Board,* 204 Okla. 419, 230 P.2d 896, 899 (1951) (when the excise board

is required to take certain ministerial acts it is subject to mandamus when it has failed to perform them); *Graves v. Board of Commissioners of Cimarron County,* 170 Okla. 282, 39 P.2d 532, 534 (1934), (Court explained that county authorities who fail or refuse to make necessary appropriations might be compelled to do so by timely action for mandamus); *Webster v. Morris,* 129 Okla. 145, 264 P. 190, 193 (1928), (counties had an obligation by law to pay costs of publishing certain notices, and mandamus would be used to compel excise board to approve estimate or appropriation of costs). The amount of the revaluation expense included in the assessor's budget is subject to the discretion of the excise board. *Humphrey v. Denney,* 757 P.2d 833 (Okla.1988).

When a budget does not include a mandatory item the Excise Board may be compelled to add the item to a budget. See *First American Bank & Trust Co. v. Board of County Commissioners of Blaine County*, 530 P.2d 121, 124 (Okla.1974) where we observed that a board must make a proper levy for sinking fund purposes when other officials have failed to act. A writ will issue to compel a board to make appropriations required by constitutional or statutory provisions.[16] When the writ is sought for immediate payment during the fiscal year the plaintiff may join as defendants those officials necessary to levy, appropriate, and issue the proper warrant for payment during that fiscal year.[17]

In a mandamus proceeding to compel payment of the revaluation expense the Assessor must show both that the amount sought was included in the Assessor's budget and in the school district's budget. If the money was appropriated for the school district's expense then mandamus is the preferred remedy to compel payment during the fiscal year.[18] If an expense is not within an appropriation or levy an application for mandamus requesting payment fails.[19]

16. *Board of Commissioners of McIntosh County v. Kirby*, 174 Okla. 20, 49 P.2d 746, 747 (1935), (statutory position of deputy court clerk could not be abolished by failure to provide salary for the position); *Little v. County Excise Bd. of Marshall County*, 161 Okla. 40, 16 P.2d 1080, 1081–1082 (1932), (writ issued to compel excise board to appropriate funds estimated by board of county commissioners for jurors, witnesses, and jury commissioners for current fiscal year when excise board made no appropriations for these expenses used to fulfill the constitutional obligations of open courts and jury trials pursuant to Okla. Const. Art. II §§ 6, 19).

17. *See e.g., Fortinberry v. Blundell*, 206 Okla. 261, 242 P.2d 427 (1952), (writ issued to compel State Treasurer to reinstate fund, Tax Commission to make deposits to that fund, Budget Director to approve certain claim against that fund, State Auditor to issue a warrant thereon, and State Treasurer to pay the warrant out of the fund or if the funds were insufficient to properly register and endorse the warrant).

18. We explained in *Board of County Commissioners of Creek County v. St. Louis–San Francisco Ry. Co.*, 170 Okla. 485, 40 P.2d 1112, 1113 (1935) that a plaintiff may not ignore a fund that includes appropriated money to pay a certain expense and, by bringing suit and obtaining judgment, throw the additional burden of costs of the action and interest upon the judgment upon the county. If the money was appropriated for the expense and money for payment exists in a fund the remedy is by mandamus to require the official to pay from the fund. *Id.*

19. *See e.g., State ex rel. Chaffin v. Excise Bd. of Okmulgee County*, 172 Okla. 425, 45 P.2d 480, 482 (1935), (record failed to show that appropriation to pay the salary of county agent was within the limits of the levy and denial of mandamus was affirmed on appeal); *Deal v. Excise Bd. of Pontotoc County*, 179 Okla. 73, 64 P.2d 859 (1937), (county had no obligation to pay a justice of the peace in excess of the amount appropriated, and trial court's denial of mandamus affirmed); *Shannon v. State ex rel. Davidson*, 33 Okla. 293, 125 P. 1106 (1912), (court directed to dismiss mandamus proceeding because board of county commissioners did not have authority to allow claims against fund in fiscal year in excess of the estimate made and approved for that fund that year). In *Chaffin* the county excise board reduced a levy and reduced an appropriation to the office of the county agricultural agent. The agent sought a writ of mandamus compelling an appropriation to pay salary and expenses. The court said that if the plaintiff had shown the trial court how the excise board could have made the requested appropriation to provide the funds while staying within its levy the writ would have been granted. *Id.* 45 P.2d at 481, 482. The agent's request for funds was denied because the funds were not within the approved levy. In *Deal* plaintiff obtained a judgment in the justice of the peace court for payment of services and sought mandamus compelling the excise board to appropriate funds to pay the judgment. The court concluded that mandamus could not be granted because the claim underlying the judgment was not within an appropriation, and "[t]o hold otherwise would be to permit municipalities to indirectly accomplish that which is expressly prohibited by section 26, art. 10 of the Constitution, to wit: '... become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof.' " *Id.* 64 P.2d at 861. In *Shannon* the plaintiffs sought mandamus to compel the board of county commissioners to approve claims and order the warrants in payment therefor. Mandamus was issued by the trial court, but on appeal that judgment was reversed with directions to dismiss the mandamus proceeding. The court explained that the county commissioners were not authorized to allow a claim against a fund in fiscal year 1911 in excess of the estimate made and approved for the fund for that fiscal year.

State funds have received a similar analysis. In *Lingo–Leeper Lbr. Co. v. Carter*, 161 Okla. 5, 17 P.2d 365, 368 (1932) the court denied an application for a writ of mandamus noting that Okla. Const. Art. 5 § 55 prohibited payment of money

The authority cited by the dissent does not support a rule to the contrary.[20] If the money was appropriated to the school board but those funds have been spent then mandamus for immediate payment during that fiscal year will be denied unless surplus funds could be transferred to the general fund and used for payment.[21] Mandamus for immediate payment will be denied if the fiscal year has lapsed.[22] Instead of allowing a sinking fund judgment for unbudgeted annual fiscal expenses and thereby penalize the taxpayers, we adopt the view that officials should use the appropriate remedies to insure that such items are properly budgeted and paid.

■■■ The school districts say they now have no money to pay, and the fiscal year lapsed prior to the appeal being filed in this Court. We have explained that payment of an annual or current expense is not to be

from the State treasury except pursuant to a valid appropriation. Later in *State ex rel. State Bd. of Public Affairs v. Principal Funding Corporation*, 519 P.2d 503 (Okla.1974) the court referred to *Lingo–Leeper* stating that "We denied the writ on the grounds that liability depended entirely upon whether there had been a valid appropriation for the construction of the building and there had not been a valid appropriation." *Id.* 519 P.2d at 504.

20. The dissent's argument to the contrary relies upon *Braine v. City of Stroud*, 385 P.2d 428 (Okla.1963); *State ex rel. Nesbitt v. District Court of Mayes County*, 440 P.2d 700 (Okla.1968); and *Smiley v. City of Tulsa*, 159 Okla. 195, 14 P.2d 942 (1932). In *Braine* the plaintiff sought a writ of mandamus and damages resulting from discontinuance of electric, water, and sewer service that caused an *injury to plaintiff's property*, (damage to a large supply of refrigerated and frozen food). A precedent appropriation is not required in an action seeking recovery for injury to plaintiff's property, *City of Stillwater v. Cundiff*, 184 Okla. 375, 87 P.2d 947, 950 (1939). *State ex rel. Nesbitt* does not apply. The trial judge in that case did issue a writ commanding certain salary payments, but this Court did not decide the propriety of this action with regard to the issue before the Court today. Additionally, the trial judge's action has no relevance here since this Court said: "The trial court's judgment is reversed with directions to deny the petition for writ of mandamus." *Id.* 440 P.2d at 708. *Smiley* does not support the dissent's argument. *Smiley* does not discuss appropriations. There is a good reason for this omission. The writ issued to compel the County Treasurer to pay funds in his control to the city. These funds were from penalties collected on delinquent sewer assessments. The city claimed ownership and the county claimed that the Treasurer held the funds in trust for the property owners from whom they were collected. *Id.* 14 P.2d at 942. This issue is discussed in *City of Shawnee v. Epple*, 188 Okla. 463, 110 P.2d 608 (1941) where the court explained that pursuant to *Seymour v. Oklahoma City*, 38 Okla. 547, 134 P. 45 (1913) "the 10 per cent interest added after delinquency constituted a penalty, and on redemption by the property owner the city, and not the warrant holder, was entitled to said 10 per cent." 110 P.2d at 610. Unlike the money in the hands of the school districts in our case today, the money in the hands of the Treasurer in *Smiley* was not appropriated to the County Treasurer, as he was merely holding, as custodian, the funds belonging to the city. In other words, no showing of an appropriated expense by the Treasurer to the city was needed in *Smiley*, as no expense by the Treasurer was made.

21. *Bell v. Board of County Commissioners*, 335 P.2d 633, 635 (Okla.1959), (court stated that trial court did not err in refusing an assessor's claim when the evidence showed that there would not be sufficient tax money available to pay the claim). Pursuant to 62 O.S.1991 § 445 a current expense could be paid from *surplus* funds originating in a sinking fund and then transferred to a general fund. *See St. Louis–San Francisco Ry. Co. v. Ottawa County Excise Bd.*, 201 Okla. 478, 207 P.2d 275 (1949).

22. *State ex rel. Wall v. Holder*, 279 P.2d 1098, 1100 (Okla.1955), (county excise board statutorily mandated to appropriate certain funds for court and also for crippled children, but denial of writ affirmed due to lapse of fiscal year); *Morton v. Adair County Excise Board*, 780 P.2d 707, 709 (Okla.1989), (although county commissioners had mandatory duty to provide funding for election board's chief clerk, the denial of the writ was affirmed due to mootness); *Clarence L. Boyd Co. v. Blachly*, 171 Okla. 626, 43 P.2d 462 (1935), (trial court's denial of writ affirmed because plaintiff failed to submit required purchase order, and the application sought payment for road tools and machinery and all funds appropriated for that purpose for the fiscal year had been expended); *Webster v. Morris*, 129 Okla. 145, 264 P. 190, 193 (1928), (court declined to issue writ in 1928 since it would "greatly disturb" the tax rolls of the county for the year 1926); *State ex rel. Decker v. Stanfield*, 34 Okla. 524, 126 P. 239 (1912), (court issued writ to require trial court to hear non-jury matters, but declined to compel the court to perform duties such as jury trials when they would incur charges against a depleted fund). Consistent with this principle is the rule that a fiscal expense will not be carried over to successive fiscal years, and taxing officials cannot include such items in their budgets. *C.D. Coggeshall & Co. v. Smiley*, 142 Okla. 8, 285 P. 48, 51 (1929); *In re Protest of Chicago, R.I. & P. Ry. Co.*, 151 Okla. 43, 2 P.2d 279 (1931).

paid from the revenues of a subsequent fiscal year. *Tulsa County Excise Bd. v. Texas–Empire Pipe Line Co.*, 180 Okla. 287, 68 P.2d 861 (1937), (general fund warrants were to be paid from general funds of that year). We agree that it is now too late to mandamus the school districts to pay the 1992 fiscal year revaluation expense from current fiscal budgets.

But the fact that mandamus should be denied does not excuse a school district from paying an assessor when the revaluation expense was appropriated for the budget of the school district. When a lawful appropriation was made for an expense, that expense was incurred and went unpaid, and the fiscal year has lapsed, then the creditor, Assessor or otherwise, obtains a judgment against the school district. For example, in *Tulsa County Excise Bd. v. Texas–Empire Pipe Line Co.*, 180 Okla. 287, 68 P.2d 861 (1937) we explained that unpaid general fund warrants issued against appropriations during a fiscal year would be paid by moneys collected during the year. However, after the warrants were reduced to judgment those judgments became sinking fund obligations paid by sinking fund levies. *Tulsa County Excise Bd.*, 68 P.2d at 863–864. If necessary, mandamus is used to compel officials to levy a tax to pay a judgment when an obligation becomes a judgment against a sinking fund. *State ex rel. Crane v. Goerke*, 191 Okla. 1, 126 P.2d 1005 (1942).

In sum, the proper procedure is for the Assessor to bill a school district for payment as required by statute. If the bill is unpaid the Assessor files mandamus during the fiscal year to require the amount to be paid, and if necessary for the amount to be included in the school district's budget. Once the item is in the budget the Assessor may still recover the amount even if the fiscal year has lapsed during the proceeding.[23]

The Assessor sought mandamus in the District Court to compel payment. The record shows that the amounts sought were included in the Assessor's budget. However, the record is silent as to whether the amounts were appropriated for the fiscal budgets of the school districts. The school districts rely upon *Board of County Commissioners, etc. v. City of Muskogee*, 820 P.2d 797 (Okla.1991) and claim that a judgment against sinking funds should be allowed for the payments to the Assessor. In *City of Muskogee, supra*, we explained that the Assessor may obtain a judgment against a school district when the district wrongfully refuses to pay the Assessor the revaluation payment. *Id.* 820 P.2d at 809. We reaffirm that holding.

In *City of Muskogee, supra*, we did say in a footnote that the failure of an excise board to allocate funds or provide an additional levy would not operate to defeat a valid statutory obligation. *Id.* 820 P.2d at 809 n. 63. However, that observation was in response to a claim that a school district or city must first receive an *increase* in its millage allocated by the excise board in order to meet the ex-

---

23. This imposes no greater burden upon the Assessor than that presented by the dissent. The dissent also requires the Assessor to file an application for mandamus to compel payment. The real crux of the dissent is that it champions a writ compelling payment when no funds have been appropriated for that purpose, while we hold today that an appropriation must be the basis for a writ or judgment compelling payment. The dissent states that the Legislature may trump our constitutional provision requiring school districts to operate on a cash basis, i.e., that legislative authority is sufficient to create governmental fiscal obligations beyond the reach of Art. 10 § 26 when it creates a revaluation payment that need not be budgeted by the payor. This issue was settled in *Del City v. F.O.P. Lodge No. 114*, 869 P.2d 309, 315 (Okla.1993), where we explained that a statutory duty to pay funds does not thereby exempt that payment from Art. 10

§ 26. We do require the Assessor to make the appropriations process a part of the mandamus case, that is, to compel the appropriation if not previously performed. The dissent exempts the Assessor from this requirement, but at the cost of disregarding Art. 10 § 26 and increasing taxes upon the taxpayers. The dissent invokes the applicability of 68 O.S.1991 § 2943. However, it also notes that this argument was later abandoned, and is therefore, not addressed herein. The dissent argues that this Court should allow judgments against the sinking fund for unbudgeted expenses because the Legislature has approved this approach. The dissent further relies upon 68 O.S.Supp.1994 § 2823(C). That provision is not before us, and we have not addressed its validity as a remedy either in addition to, or as an alternative to, the remedies discussed herein.

pense of the payments to the assessor. Our observation referenced language stating the following:

> The statutory language evinces legislative intent that once the revaluation cost is included in a recipient's budget, it is a legal and valid expenditure. Nowhere do we find either in § 2481.4 or in the statutory revaluation scheme that the legislature had intended for the excise board to increase a recipient's millage for that entity's reimbursement to the county of its assessed share.

*Id.* 820 P.2d at 806.

The "recipient's budget", i.e., the school district's budget, must include the revaluation cost to make that cost a valid and legal expenditure. *Id.* We reaffirm that holding.

■■■ We also said in *Muskogee* that excluding a legitimate government expense item from a city's budget could not immunize the city from liability for a validly incurred obligation. *Id.* 820 P.2d at 809–810. We conclude that this language is too expansive. As we also noted above in *Muskogee* an expenditure becomes a legal and valid expenditure once it is included in a budget. A school district's revaluation expense does not become a legal and valid expenditure until it is included in that district's budget as authorized by the appropriate county board.

### IV.

■■■ School districts challenged the act of the Assessor in moving twenty-two employees from the regular budget to the revaluation budget. The Excise Board has discretion in determining the budget of the Assessor. This determination may be reviewed in a mandamus proceeding in the trial court with subsequent appeal to this Court. *Humphrey v. Denney,* 757 P.2d 833 (Okla. 1988). The trial court has the authority to determine whether the Excise Board acted arbitrarily by approving an unauthorized funding request. *Id.* 757 P.2d at 836. The school districts had the burden of presenting evidence to that court showing an abuse of discretion on the part of the county board. *Summey v. Tisdale,* 658 P.2d 464, 469–470 (Okla.1982); *Rogers v. Excise Bd. of Greer*

*County,* 701 P.2d 754, 760 (Okla.1984). They must then show on appeal that the trial court abused its discretion in declining to award relief. *Beatrice Foods Company v. City of Okmulgee,* 381 P.2d 863, 868 (Okla.1963). They have not done so. The District Court's order denying the school districts' challenge to the amount of the revaluation budget is affirmed.

### Conclusion

In our case today the Assessor's remedy was to use mandamus during the fiscal year to compel the school boards and Excise Board to (1) include the revaluation expenses in the budgets of the schools, and (2) compel the districts to make immediate payments to the Assessor. Mandamus is inappropriate once the fiscal year has lapsed, and the fiscal year beginning July 1, 1992 was completed before the appeal was filed in this Court. Once the budgets of the school districts were made during the fiscal year to include the payments due that year, the lapse of the fiscal year would be no bar to obtaining a civil judgment against the school districts for the budgeted amounts left unpaid. The fiscal year has lapsed and no showing has been made that the budgets of the school districts included the payments they were required by law to make to the assessor. However, we decline to remand this case for the Assessor to make this showing.

The suit against the school districts was filed approximately three months after the mandate issued in *Board of County Commissioners, etc. v. City of Muskogee, supra.* The school districts relied upon this opinion in the trial court, and requested that the judgment against the school districts be paid from three annual sinking fund levies. We agree that *City of Muskogee* could have been relied upon by the school officials for this proposition.

We recognize that judgments may have been obtained and payments made to Assessors in compliance with *City of Muskogee.* We decline to cast any shadow of legal impropriety upon such judgments, and we thus make our ruling herein prospective, beginning July 1, 1997. *Harry R. Carlile Trust v. Cotton Petroleum,* 732 P.2d 438, 445–449

(Okla.1986), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *Oklahoma County v. Queen City Lodge No. 197, I.O.O.F.,* 195 Okla. 131, 156 P.2d 340, 358 (1945).

We emphasize that the revaluation expense *must* be included in a school district's budget before an Assessor may obtain a judgment against a school district for that expense. The revaluation expense *must* be included in a school district's budget before an Assessor may obtain a mandamus order compelling immediate payment. If the revaluation expense is not included in the school district's budget the Assessor must compel by mandamus the appropriate officials to include the expense in the school district's budget, and this may be done in a prior mandamus proceeding or in a mandamus proceeding that both orders those officials to include the item in the budget and the school officials to make immediate payment. In sum, a judgment to compel payment of the revaluation expense, whether by mandamus during the fiscal year or sinking fund judgment after the fiscal year, must be based upon that expense being included in the budget of the school district.

The amounts sought from the school districts are for current fiscal expenses incurred during the July 1, 1992—June 30, 1993 fiscal year. The lapse of the fiscal year would ordinarily moot this mandamus proceeding. However, in light of *Board of County Commissioners v. City of Muskogee, supra,* we affirm the judgment against the school districts based upon the following conditions to be satisfied upon remand to the District Court.

The Assessor shall show that the amounts sought from the school districts were actually expended by the Assessor. She must show that the funds now sought by a judgment against the school districts are necessary to repay or replenish a public fund that was used to cover those expenses actually made by the Assessor in fiscal year July 1, 1992—June 30, 1993, and that should have been funded by the payments from the school districts. The Assessor is not entitled to a

judgment against the school districts and thereby obtain funds to be used for purposes other than the expenses for the fiscal year 1992–1993.

If the Assessor makes this post-judgment showing the judgment of the District Court shall stand affirmed as to the liability of the school districts. Payment of this judgment shall conform to *Board of County Commissioners, etc. v. City of Muskogee, supra,* where we explained that such an order "represents a sinking fund obligation which may be paid either out of surplus revenues in the sinking fund or from three annual sinking fund levies." *Id.* 820 P.2d at 810. If the Assessor cannot make this showing the District Court shall vacate its judgment and dismiss the proceeding.

The opinion of the Court of Appeals is vacated. The judgment of the District Court is affirmed in part and reversed in part, subject to the requirements imposed herein, and the case is thus remanded for disposition.

KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, SIMMS, ALMA WILSON and WATT, JJ., concur.

HARGRAVE and OPALA, JJ., dissent.

OPALA, Justice, dissenting.

The court today (a) *narrows* the teachings of *Board of County Commissioners v. City of Muskogee* [1] (which holds that when there is a *statute-imposed duty* to pay revaluation costs, a writ ordering the payment of these delinquent costs represents a sinking fund obligation which may be satisfied either out of surplus revenues in that fund or from three annual levies); [2] (b) *transforms* an ad valorem tax recipient's statutory obligation to pay its share of revaluation costs into a fictitious quasi-contractual debt that may be defeated by failure to include revaluation costs in an obligor's annual budget request; (c) *constricts the availability of mandamus* as a remedy against recalcitrant statutory obligors of revaluation costs; (d) *gives* its pro-

---

**1.** Okl., 820 P.2d 797, 810 (1991).

**2.** 62 O.S.1991 §§ 431, 435, *infra* note 19; *Board of Educ., infra* note 20, 43 P.2d at 140; *Goerke, infra* note 20, 126 P.2d at 1006.

nouncement purely prospective effect,[3] which makes these obligor-school districts, who failed to include revaluation costs in their 1992–1993 budget, stand subject to this court's extant *Muskogee* teachings and (e) *remands* this cause for further proceedings.

I *must recede* from today's pronouncement. The court's opinion (a) *exonerates* derelict school district officials from amenability to any civil remedy for *their failure, however deliberate, to include* the statutorily mandated revaluation obligation of the school district in the annual county budget and (b) *impermissibly shifts* this statutory responsibility to county officials. The court's approach enjoins upon county officers the task of protecting *the county from continued official school districts' lawlessness* by waging never-ending litigation that is needed to enforce a recipient's cost-inclusion duty. Because this solution cannot absolutely assure timely and effective collection of *delinquent revaluation costs,* which are unbudgeted, the county government will be condemned to absorb the entire cost and then pass the loss on to the taxpayers (a) by increasing the next year's assessments for added revenues or (b) by curbing services to the taxpayer. My analysis for the controversy's settlement would (a) *reaffirm all* the teachings of *Muskogee,* (b) *leave* in place the district court's mandamus order, (c) *allow* its enforcement by resort to the school districts' sinking funds and (d) strictly *enforce against offending school district officials* the penalty provisions of the Ad Valorem Tax Code[4] whenever the obligor district's dereliction (by nonfeasance) is judicially found to have been inexcusable.

## I

### THE CONSEQUENCES OF TODAY'S PRONOUNCEMENT

Without any semblance of authority in extant constitutional jurisprudence, today's opinion *nullifies* well-settled legislative power to impose upon a political subdivision the obligation to pay for beneficial services received. Those statutorily-imposed obligations are now made dependent for their efficacy on this court's willingness to support their enforcement by supplying the critical implied-in-law (quasi-contractual) promise. *The legislature will never know—when in the future it creates a statutory obligation— whether the court will enforce it by providing the critical promise.*

Even though the court does not view the statute that created the obligation as constitutionally infirm, it nonetheless *cavalierly exonerates an entire class of obligors* from performance of a legislatively imposed obligation. Today's pronouncement plainly provides delinquent school districts with a generous escape hatch by destroying all avenues of enforcement available against them. There is no jurisprudential support for today's *ipse dixit* that *distorts* the school district's statutory obligation. *Legislative power to create obligations that fall into the class here in controversy is not subject to quasi-contractual principles.*

By sheer judicial *fiat* the court *first* transmogrifies a legislatively imposed duty to pay into an implied-in-law obligation and *then* invalidates it as an unbudgeted "debt". This distortion is achieved by labeling as a debt *the duty* of a political subdivision to obey the legislative act that creates an explicit and unequivocal obligation to pay money for services received or to be received. The opinion's prospective reach (a) casts a heavy constitutional cloud over extant legislation[5] that codifies the *Muskogee*-prescribed regime and (b) needlessly undermines the force of the post-*Muskogee* enactment whose validity is facially crippled.

Today's pronouncement is more concerned with the pretense of protecting taxpayers from additional levies than with stopping games of lawlessness at the courthouse. My

---

3. "Purely prospective" means that the opinion has no effect upon the obligation in controversy. See *Harry R. Carlile Trust v. Cotton Petroleum,* Okl., 732 P.2d 438, 447–448 nn. 46, 49 (1987), which gives purely prospective sweep to a new constitutional rule declared in a collateral attack upon a Corporation Commission spacing order.

4. *See* the terms of 68 O.S.1991 § 2943, *infra* note 44.

5. *See* Part VII *infra* for the text of 68 O.S.Supp. 1994 § 2823(C).

concerns, on the other hand, focus (1) on fidelity to valid legislative enactments; (2) on lawful interaction of revenue recipients within the courthouse; and (3) on enforcing against all these recipients, fairly and even-handedly, *the duties* imposed by the legislature rather than on making some of these obligors virtually untouchable by present enforcement remedies. Were I writing for the court, I would put a stop to the courthouse games by making them far too expensive to play for the individual school district-obligors and for the responsible officials involved. Offending school district officials must be held accountable for their failure to obey the statute's mandate. They should not be, as they are today, judicially licensed to ignore their duty with absolute impunity.

## II

### THE ANATOMY OF LITIGATION

The Tulsa County Assessor [Assessor] sought mandamus to compel Tulsa County Independent School Districts Nos. 1, 5 and 11 and their respective boards [Districts] to pay their proportionate share of the Assessor's 1992–93 visual inspection budget for the ad valorem property tax revaluation program in compliance with the terms of 68 O.S.1991 § 2823.[6] The Districts objected to the payment because they *neither* (a) had received notice that the visual inspection budget had been increased by approximately $525,000 *nor* (b) had they been afforded an opportunity to protest the increase before the Tulsa County Excise Board [Board] as required by 68 O.S.Supp.1992 § 2822.[7] At the March 30, 1993 hearing the district judge *stated* that (a) because the Districts had not received the statutorily mandated notice of the county's amended budget, *he would hold* the mandamus action in abeyance until the Districts had an opportunity to appear before the Board and (b) he would then entertain any "administrative appeal" that might be brought from the Board's decision as ancil-

lary to the main (mandamus) action before him. The Districts then filed a protest with the Board. After a two-day hearing, the Board denied, on April 23, 1993, the Districts' challenge and upheld the amended visual inspection budget.

On April 27, 1993 the Assessor filed *in the mandamus proceeding* a "renewed motion" to compel payment of the Districts' 1992–1993 share of the revaluation budget. In their June 1, 1993 trial brief the Districts pressed for reversal of the Board's decision. The trial court (a) *affirmed the Board's ruling* and (b) *granted mandamus* commanding the Districts to pay their share of the visual inspection budget. The Districts brought an appeal from that decision.

In a nisi prius post-mandamus proceeding the Districts moved to settle the journal entry of judgment, urging the trial court to include a statement that their adjudicated obligation may be satisfied by resort to the sinking funds.[8] The district court refused to set out the permissible enforcement procedure, stating that its earlier writ of mandamus "resolves all issues in the case." The Districts then amended their petition in error, pressing for review of the post-mandamus order as well.

The Court of Appeals affirmed, holding that while (1) the statutory scheme for mandatory ad valorem tax revaluation is constitutional, (2) the mandamus order *does not constitute a money judgment* that may be satisfied from the sinking funds.

## III

### THE STATUTORY AD VALOREM TAX VISUAL INSPECTION/REVALUATION PROGRAM

The statutory ad valorem tax visual inspection/revaluation program is a comprehensive statewide regime for affecting all taxable property within each county of the State.[9]

---

6. For the pertinent provisions of 68 O.S.1991 § 2823(A), see *infra* note 11.

7. For the pertinent terms of 68 O.S.Supp.1992 § 2822(B) and (C), see *infra* note 13.

8. For the terms of Art 10 § 28, Okl. Const., and 62 O.S.1991 § 431—which require maintenance of sinking funds—*see infra* notes 18 and 19.

9. The terms of 68 O.S.1991 § 2820(A) provide:

The *process of revaluation* must be carried out on a continuous basis and occur at least every four years.[10] Each county assessor must make *adequate provision* for the project and submit to the county excise board—for review and approval—a special budget to be treated as separate from that which is regularly prepared.[11] The excise board then apportions the cost *among the recipient entities* of the affected ad valorem tax revenue.[12] The recipients are entitled to receive a copy of the visual inspection budget and may appear before the county excise board to make comment concerning the costs to be taxed.[13] It is by this regime that a statutory duty is imposed on each recipient entity to pay its share of the visual inspection program.[14] Because schools are recipients of ad valorem tax revenue, the school districts stand subject to this explicitly imposed statutory duty.

# IV

## EXTANT JURISPRUDENCE PROVIDES A FIRM FOUNDATION FOR TREATING A *MANDAMUS–BASED DUTY TO PAY* AS A *SINKING FUND OBLIGATION*

*Board of County Commissioners of Muskogee County v. City of Muskogee*[15]—whose parameters are needlessly narrowed by today's opinion—teaches that a mandamus

---

"Each county assessor shall conduct a comprehensive program for the individual visual inspection of all taxable real property within his respective county. Each assessor shall thereafter maintain an active and systematic program of visual inspection on a continuous basis and shall establish an inspection schedule which will result in the individual visual inspection of all taxable real property within the county at least once each four (4) years."

*See also* 68 O.S.1991 § 2821, pertaining to physical inspection as part of the visual inspection.

**10.** 68 O.S.1991 § 2820(A), *supra* note 9.

**11.** The terms of 68 O.S.Supp.1992 § 2822(A) (eff. June 9, 1992) are:

"Each county assessor in budgets submitted to the county excise board or county budget board shall make *adequate provision* to effect countywide visual inspections of real property during the four-year cycle." (Emphasis added.)

The 1993 and 1994 amendments to § 2822 have no legal effect on this case.

The terms of 68 O.S.1991 § 2823(A), the version applicable to this case, provided:

"For the fiscal year *beginning July 1, 1992*, and each year thereafter, the cost of the comprehensive program of visual inspection for real property shall be paid by appropriate warrants from those who receive the revenues of the mill rates levied on the property of the county as prescribed by this section. The county assessor shall prepare a budget for the comprehensive program of visual inspections for real property and file such budget with the county excise board or county budget board." (Emphasis added.)

The 1992 and 1994 amendments to § 2823 have no legal effect on this case.

**12.** The pertinent terms of 68 O.S.1991 § 2823(B) and (D) are:

"B. The county excise board or county budget board shall apportion such cost among the various recipients of revenues from the mill rates levied, including the county, all cities and towns, all school districts, *excluding any sinking funds of such recipients* . . .

\* \* \* \* \* \*

D. The county assessor shall render a statement to each of the jurisdictions within the county which receive revenue from an ad valorem mill rate *excluding sinking funds.*" (Emphasis added.)

The 1992 and 1994 amendments to § 2823 have no legal effect on this case.

**13.** The terms of 68 O.S.Supp.1992 § 2822(B) and (C) provide in pertinent part:

"B. Each jurisdiction within a county which receives revenue from an ad valorem mill rate *shall receive a copy of the budget for the countywide visual inspection program* for that county. Such jurisdictions shall have the opportunity to appear before the county excise board or the county budget board *to provide comments, information and documentation* concerning the budgets submitted by the county assessor pursuant to subsection A of this section.

C. The several county excise and budget boards, in passing upon budgets submitted by the several assessors, shall authorize and levy amounts which will suffice to carry out the countywide visual inspection program as approved by the Oklahoma Tax Commission under Section 2820 of this title. *Any disputes as to the amount authorized to carry out the countywide visual inspection program shall be resolved by the county excise board.*" (Emphasis added.)

The 1993 and 1994 amendments to § 2822 have no legal effect on this case.

**14.** 68 O.S.1991 § 2823(A), *supra* note 11; *Muskogee, supra* note 1 at 803.

**15.** *Muskogee, supra* note 1 at 809.

writ[16] *commanding the performance of a statutory duty to pay* is the functional equivalent and the legal analogue of a *money judgment.* Extant jurisprudence undergirds this principle and *in no way limits its application solely to budgeted expenses.*[17] *Money judgments* against school districts may be satisfied in *only* one fashion—by resort to the constitutional[18] and statute-mandated[19] sinking fund. It hence follows that *when* the legislature has cast upon the Districts a duty to pay their proportionate share of revaluation costs, the order that commands them to make such payment represents a sinking fund obligation *ex lege.*[20]

Because I would neither erase the settled law's memory nor ignore binding precedent, I would hold today that a writ of mandamus to pay revaluation costs calls for the perfor-

---

**16.** The terms of 12 O.S.1991 § 1451 are:

"The writ of mandamus *may be issued* by the Supreme Court or the district court ... to any inferior tribunal, corporation, board or person, *to compel the performance of any act which the law specially enjoins as duty* resulting from an office, trust or station; *but* though it may require an inferior tribunal to exercise its judgment or proceed to the discharge of any of its functions, it *cannot control judicial discretion.*" (Emphasis added.)

The terms of 12 O.S.1991 § 1452 are:

"This writ may not be issued in any case where there is a plain and adequate remedy in the ordinary course of the law. It may be issued on the information of the party beneficially interested."

**17.** *Braine v. City of Stroud,* Okl., 385 P.2d 428, 430 (1963); *In re Epley,* 10 Okl. 631, 64 P. 18, 19–20 (1901). *See also State v. District Court of Mayes County,* Okl., 440 P.2d 700, 708 (1968) (overruled in part on other grounds by *Palmer v. Belford,* Okl., 527 P.2d 589, 592 (1974)); *Smiley v. City of Tulsa,* 159 Okl. 195, 14 P.2d 942, 943 (1932).

**18.** The pertinent terms of Art. 10, § 28, Okl. Const., are:

"[S]chool districts ... *shall* levy sufficient additional revenue to create a sinking fund to be used ... for the payments of such parts of judgments as such [districts] may, *by law* be required to pay." (Emphasis added.)

**19.** The terms of 62 O.S.1991 § 431 provide in pertinent part:

"It shall be the *duty* of the officers of each municipal corporation in the State of Oklahoma *by law* authorized to levy taxes to make a levy each year for a sinking fund, which shall ... be sufficient to pay ... [a] sum ... equal to one-third (⅓) of the original amount of *all outstanding judgements* against the municipality when one-third (⅓) or more of each judgment remains due and unpaid, and in case less than one-third (⅓) of such judgment remains due then for the entire amount of such judgment yet remaining unpaid ..." (Emphasis added.)

The pertinent terms of 62 O.S.1991 § 435 are:

"... Such sinking funds shall be used ... [f]or the payment of *judgments* against the municipality...." (Emphasis added.)

The pertinent terms of 62 O.S.1991 § 365.5 were:

"Money judgments against any county *or other municipal subdivisions of the State of Oklahoma shall be paid in the following manner, and may be paid in no other manner ....* [The municipal treasurer] shall ... canvass his sinking fund for the purpose of ascertaining if there be in his sinking fund for such municipality an amount of actual cash over and above the amount of cash needed to pay all coupons and bonds matured and maturing therein within the time such sinking fund will be replenished from levies made or to be made for such judgment ... he shall approve such claim in such amount as is neither in excess of such claim nor in excess of the actual cash reserve necessary for coupons and bonds as hereinbefore defined and shall transmit it to the clerk of such municipality." (Emphasis added.)

The 1994 amendment to § 365.5 has no legal effect on this case.

The terms of 62 O.S.1991 § 361 were amended in 1993 to provide:

"The term "judgment" shall be construed to mean the final determination by any court of competent jurisdiction in any action or proceeding *to determine the rights of parties.*" (Emphasis added.)

Okl.Sess.L.1993, Ch. 318, § 3 (62 O.S.Supp.1993 § 361). A mandamus order determines the rights of parties to an action in which it is sought. *See Braine, supra* note 17 at 431; *Mayes County, supra* note 17 at 708. While the 1993 amendment has no legal effect on this litigation, it is entirely consistent with the teachings of *Muskogee, supra* note 1 at 809–810.

**20.** 62 O.S.1991 §§ 431, 435 *supra* note 19; *Muskogee, supra* note 1 at 810; *Bd. of Educ. v. Bd. of County Com'rs,* 171 Okl. 464, 43 P.2d 139, 140 (1935); *State v. Goerke,* 191 Okl. 1, 126 P.2d 1005, 1006 (1942). Primary resort *must* be had to the budgeted funds. Only upon their exhaustion may a mandamus judgment be enforced against other sources. The trial court's refusal—in the post-mandamus proceeding—to *settle the journal entry of judgment* by detailing the applicable enforcement procedure is not a bar to the *invocation of the Muskogee-authorized collection method.*

mance of a statute-imposed duty and hence represents a *sinking fund* obligation *as a matter of law.* This solution would avoid coming to grips with the constitutional infirmity addressed by the court's opinion.

## A.

### *Judicial Scrapping of the Muskogee Sinking–Fund Remedy*

The court holds that mandamus can *never* be used to create a sinking fund obligation without an appropriated annual expense. *None of the cases the court cites for this spurious doctrine stands for the invoked proposition.*[21] Today's pronouncement allows mandamus as a remedy *only* if (1) funds have been appropriated, (2) the Assessor had included the revaluation costs in her annual budget, (3) unspent budgeted funds of the obligor were available to pay the Districts' share, (4) the mandamus claim is pressed *in the fiscal year for which revaluation costs are sought to be recouped* and (5) fiscal confusion (i.e., a year-end payment order) will not result.

The court's ill-crafted substitution for settled law *ignores* the offending officials' (recalcitrant obligor-agencies') *statutory duty to budget and to pay* their share of the revaluation costs. Today's approach *errs* by *wrongly superimposing* upon the statute's unequivocal command the obligee's (Assessor's) extra-statutory burden (a) to *monitor* the district's budgets, and (b) to *seek and secure* mandamus during the fiscal year for the obligation in order to compel an obligor to include, and the Excise Board to approve, an appropriation for the revaluation expense.

## B.

### *The Impact of the Muskogee-prescribed Regime is Unnecessarily Narrowed*

Today's constriction of the *Muskogee* analysis rests on the view that when an obligor is allowed to resort to sinking funds for satisfaction of an *unbudgeted* revaluation liability, a *penalty* is levied on taxpayers, contrary to the constitutional "cash" or "pay-as-you-go plan."[22] The court's conclusion is unsupported by extant jurisprudence. *Graves v. Bd. of Comm'rs. of Cimarron County,*[23] cited in the opinion, is inapposite. That case found constitutionally infirm an obligation rested upon a *voluntarily-entered* contract, much the same as the court's teaching in *Del City v. FOP Lodge No. 114.*[24] These authorities are plainly both inapplicable to and dissimilar from the case before the court today, which deals with an *involuntary duty* cast by the law's command rather than with a voluntary contractual obligation. *Law-imposed obligations are free from the budgeting strictures of Art. 10, § 26, Okl. Const.,*[25] *whose provisions prohibit public funds from being encumbered beyond a single fiscal year. An uninterrupted line of authority unequivocally supports this long-recognized exception for statute-cast duty.*[26] Today's opinion marks the *only* departure.

Sinking funds are constitutionally mandated.[27] Resort to them *must be treated as an authorized exception* (to the provisions in Art. 10, § 26[28]) for collection of all law-imposed liabilities that are involuntarily in-

---

**21.** For this doctrine the court's opinion erroneously cites *Deal v. Excise Bd. of Pontotoc County,* 179 Okl. 73, 64 P.2d 859, 860 (1937); *Chaffin v. Excise Bd. of Okmulgee County,* 172 Okl. 425, 45 P.2d 480, 482 (1935); *Shannon v. Davidson,* 33 Okl. 293, 125 P. 1106, 1107 (1912).

**22.** *Del City v. FOP Lodge No. 114,* Okl., 869 P.2d 309, 311 (1994).

**23.** 170 Okl. 282, 39 P.2d 532, 533 (1934).

**24.** Okl., 869 P.2d 309, 311 (1994).

**25.** For the pertinent terms of Art. 10, § 26, Okl. Const., see *infra* note 31.

**26.** *Board of County Com'rs v. Mullins,* 202 Okl. 628, 217 P.2d 835, 842 (1950); *City of Claremore v. Oklahoma Tax Commission,* 197 Okl. 223, 169 P.2d 299, 303 (1946); *Liberty Nat. Bank v. County Excise Board,* 175 Okl. 245, 52 P.2d 51, 53 (1935), cf. *Del City v. FOP Lodge No. 114,* supra note 22.

**27.** For the pertinent terms of Art. 10, § 28, Okl. Const., see *supra* note 18.

**28.** For the pertinent terms of Art. 10, § 26, Okl. Const., *see infra* note 31.

curred.[29] There is *no* authority for the court's refusal today to honor the settled doctrine.

## V

## WITHOUT ANY TEXTUAL OR JURIS-PRUDENTIAL WARRANT, TODAY'S PRONOUNCEMENT TRANSMOGRI-FIES A LEGISLATIVELY–IMPOSED LIABILITY INTO A QUASI–CONTRACT

The narrow question to be answered here is whether the legislature, having created an explicit *duty* to pay and a *status relationship* between the county-obligor and the school district as an obligee, has the power to expect that its statute-commanded obligations will be enforced without judicial interposition of a promise to pay through the fiction of a quasi-contract. The public-law duty to pay revaluation costs is based on an *obligor-obligee status relationship* between two public-law entities. By that legislative status the school district is made the *obligor* and the county its *obligee*.

The court's opinion arbitrarily (and *sans* legal authority) *labels* the Districts' post-fiscal-year statutory revaluation obligation as one in quasi-contract and enforceable in assumpsit.[30] It reasons that because the *remedy* for this obligation's breach is to be treated as one on the contract, it constitutes a "debt" within the meaning of the limit imposed by Art. 10, § 26, Okl. Const.[31] The Assessor's claim to this obligation is erroneously downgraded as subject to the terms of 62 O.S.1991 §§ 361–363, which require (1) an appropriation of funds and (2) an itemization of the contractual indebtedness sought to be reduced to judgment. Today's unwarranted mischaracterization of the revaluation obligation as quasi-contractual transforms the law's existing *command* to pay the revaluation expense *into a worthless* implied-in-law *promise* which, when unbudgeted, becomes unenforceable.

*There is no extant Oklahoma jurisprudence to support the court's quasi-contractual analysis.* The theory is not only harmful but unnecessary as well. For the enforcement of obligations, pre–1600 English common law was dominated by the concept of *duty cast* rather than of *promise fulfilled.*[32]

---

**29.** *Mullins, supra* note 26 at 842; *City of Claremore, supra* note 26 at 303; *Liberty Nat. Bank, supra* note 26 at 53.

**30.** *Bullard v. Bell,* 4 Fed.Cas. 624, 640 (1817).

**31.** The pertinent terms of Art 10, § 26, Okl. Const., are:
"[N]o ... *school district* ... shall be *allowed* to become indebted, *in any manner,* or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof...." (Emphasis added.)

**32.** In the fourteenth century—before the development of assumpsit—the forms of action used in contractual matters were *debt, detinue, account* and *covenant.* James B. Ames, Lectures On Legal History 156, 122 (1913). The oldest contractual action in the fourteenth century was the writ of debt. " * * * [T]he early real contract or simple debt *was founded directly on legal duty and did not derive its obligatory force from any word or promise of either party."* (Emphasis added.) Thomas Street, The Foundations of Legal Liability, vol. 1, p. 2 (1906). Debt did not imply a promise to pay the creditor; it dealt with a relationship (status) between parties which created a duty. Theodore F.T. Plucknett, A Concise History of the Common Law 633 (5th ed. 1956). In short, the *status*—not a promise to pay—created the debt.

*Plucknett* at 363. With the debt there was no question of an undertaking. The relationship sprung from the exchange of "grants," not promises. The grant that the debtor gave to the creditor was the debt itself. A.W.B. Simpson, A History of the Common Law of Contract 80 (1975); *Ames, supra* at 89. "... [M]edieval lawyers saw a debt as more like property than breach of promise." (Emphasis added.) J.H. Baker, An Introduction to English Legal History 365 (3d ed. 1990). There was also a difference between detinue and debt. Detinue dealt with specific chattels, which were *owned*; debt dealt with money or fungibles, which were *owed* (and hence under duty to return or repay). *Id.* at 365. An action on account generally was applicable to only a few types of relationships, such as partners. *Plucknett, supra* at 635. The idea of the exchange of mutual promises, coupled with the notion of consideration, did not gain acceptance until after the development and modification of assumpsit itself. *Ames, supra* at 122. "Prior to ... [1600] the term 'contract' meant no more and no less than an obligation actionable in debt." *Street, supra,* vol. 2, 59–60. *See also* R.H. Graveson, Status In The Common Law at 33 (*The Movement From Status to Contract* ) (University of London Athlone Press 1953); Patrick Selim Atiyah, The Rise and Fall of Freedom of Contract, 36–37, 40–143. 163, 416–417 (Oxford University Press 1979); 1 Williston, A Treatise on the Law of

The duty cast was one that was either voluntarily entered into, in which case it was called *vinculum juris* (or *iuris*),[33] or one cast by law regardless of any act by the obligor. In the latter case it was called *vinculum legis*. When the law *moved from status and duty to promise* by developing the principles of modern contract,[34] the earlier notion of duty survived to continue in existence parallel with promise-based obligations. Duty-based obligations, long cognizable at common law, continue to stand *unabrogated by statute* and *undiluted by Oklahoma's extant jurisprudence*.[35]

The early notion of a quasi-contractual recovery manifests itself in the common count for money had and received,[36] which is a purely restitutionary claim.[37] The Oklahoma, as well as the English, remedy for recovery of money paid under an unenforceable, void, voidable or otherwise frustrated contract is in quasi-contract.[38] An implied-in-law promise will be supplied from one who

CONTRACTS, § 32A (*Duties Imposed by Law Without Assent Distinguished*) at 88–92 (3d ed. 1957); Corbin, Quasi–Contractual Obligations, 21 Yale L.J. 533–537 n. 17 (1912).

33. "In the Roman law, an obligation is defined as a vinculum juris, i.e., 'a bond of law,' whereby one party becomes or is bound to another to do something according to law." Black's Law Dictionary, 1407 (5th Ed.1979). *See also* Henry Sumner Maine, ANCIENT LAW 314–315 (1883). It is the bond (rather than a promise) that creates a legally enforceable duty. "An obligation is a legal bond, with which we are bound by a necessity of performing some act according to the laws of our State." *Inst. of Just.*, 3, 13 (quoted in Arthur L. Corbin, Quasi–Contractual Obligations, 21 Yale L.J. 532, 552 n. 80 (1912)). As Thomas Street notes (*supra* note 32, vol. 3, pgs. 7–8):

It is to be observed that the terms 'right' and 'duty' are substantial correlatives. They are, in fact, only different names for different aspects of that legal obligation (*vinculum juris* ), by which men are held in jural relations. The term 'duty' is the name applied to the legal tie when it is viewed from the standpoint of the person who is bound to do; while the term 'right' is used when the same tie is viewed from the standpoint of the person entitled to performance.

34. Assumpsit evolved from trespass actions. *Baker, supra* note 32 at 374–375. *See Street, supra* note 32, vol. 3 at 172–173 (assumpsit is an action on the case in the nature of deceit). At first, a duty was based upon either law and custom or a previous transaction between the parties. *Simpson, supra* note 32 at 205–207. Eventually the source of the duty evolved into "assumpsit," which meant that the defendant *undertook* "to do something, and then did it badly to the damage of the plaintiff." *Baker, supra* note 32 at 375. Simple assumpsit became an action for the nonperformance of a parol or simple contract. RESTATEMENT OF RESTITUTION, pt. I, introductory note, at 15 (1937). Assumpsit was initially available only for the nonperformance on a simple contract. 1 George Palmer, THE LAW OF RESTITUTION 6 (1978). The courts then began to recognize that assumpsit could be used to en-

force a debt if the defendant had made a promise to pay it at the same time or after the debt was created. *Baker, supra* note 32 at 389–392. The latter action, known as *indebitatus assumpsit*, originated early in the sixteenth century. Slade's Case, 76 Eng.Rep. 1072 (K.B.1602), allowed *indebitatus assumpsit* to enforce a debt without proof of a subsequent promise to pay. The "assumpsit" itself was presumed.

35. *Street, supra* note 32 at 65 (vol. 2), observes that:

"Our law of contract is unshakably planted *upon two conceptions instead of one*. The idea of contractual duty imposed by law, which was the first conception of contract revealed in the common law, eternally abides. *It has not been supplanted; it has only been in a measure obscured by the modern conception of the obligation of promise* .... [T]he sole clue to a proper understanding of quasi-contracts is found in the *ancient and indestructible conception of contractual duty imposed by law*. A thing to be constantly borne in mind by the student of modern contract law is that in dealing with the mysterious implied promise, he is really in contact with the simple debt in disguise. The implied promise is purely a remedial fiction. *Slade's Case* ... sheds a false light on the subsequent history of contract, because it so easily gives rise to the misleading inference that the conception of the debt has been superseded and extinguished by the notion of the obligation of promise." (Emphasis added.)

36. *Baker, supra* note 32 at 410.

37. Arthur Rosett, CONTRACT LAW AND ITS APPLICATION 341 (4th ed. 1988).

38. The quasi-contractual obligation arises "without reference to the assent of the obligor, from the receipt of a benefit the retention of which is unjust, and requiring the obligor to make restitution." Frederic C. Woodward, THE LAW OF QUASI CONTRACTS 4 (1913). For a general discussion of implied-in-law contracts, see *Shebester v. Triple Crown Insurers*, Okl., 826 P.2d 603, 610 (1992); see also *Hughes v. Reed*, 46 F.2d 435, 440 (10th Cir.1931). A quasi-contractual obligation is one

must return that which cannot be kept in good faith.[39]

Unlike the examples from restitution, there is no extant authority to support today's notion that the law *must supply a promise* from a statutory obligor upon whom a valid enactment has cast, unequivocally and explicitly, the duty to pay.[40] *This is not an action for restitution.* When, as here, *the obligor's liability stands directly and explicitly imposed by law,* no promise need be implied. Simply put, the statute creates a duty that is *enforceable without a promise* (real or fictional). This is so because *the statutory liability in contest here is duty-, not promise-based.*[41] That is enough. *The quasi-contract's implied-in-law promise may be needed only where there is neither a promise nor legal duty to pay.*[42]

*I would hence hold that the solemn statutory obligation of a school district, sought to be enforced here, may not be downgraded to a quasi-contractual rubric.*

---

imposed by the legal fiction of a promise implied in law. *Shebester, supra* at 610 n. 30.

**39.** *See* this court's holding in *Burford v. Bridwell,* 199 Okl. 245, 185 P.2d 216, 218–219 (1947), where the applicable rule is said to be that a purchaser of realty cannot recover money paid on the purchase price under an unenforceable contract, which the seller has not repudiated, but is ready, willing, and able to perform. *Roussel v. Russell,* Okl., 339 P.2d 522, 527–528 (1959) and *Hawkins v. Wright,* 204 Okl. 55, 226 P.2d 957, 962–963 (1951), declare a similar application of quasi-contractual principles.

**40.** The federal and state cases cited in support of the court's quasi-contractual analysis are *inapposite* to this case. The court relies on *U.S. v. P/B STCO,* 756 F.2d 364 (5th Cir.1985), *Metropolitan Railroad Co. v. Dist. of Columbia,* 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889); *Wyandotte Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *Inhabitants of Milford v. Commonwealth,* 144 Mass. 64, 10 N.E. 516 (1887). These cases deal with the performance *by a third party* of another's statutory obligation, rather than by the legal obligor from whom performance was due. They illustrate that the performance of another's statutory duty can give rise to a claim for unjust enrichment. The issue pressed is whether the third party could recover from the legal obligor and, if so, would the law supply the requisite promise. (1) In *P/B STCO,* the federal government sought the recovery of the costs of cleaning up oil discharged from barges into navigable waters under the Federal Water Pollution Control Act, 33 U.S.C. § 1321. The act imposes a primary duty on the polluter to clean up and, upon its nonperformance, authorizes the federal government to clean up and recover its costs. (2) Similarly, in *Wyandotte,* the federal government pressed for recovery of its removal costs under the Rivers and Harbors Act, 33 U.S.C. § 409, which imposes a duty on the owner of a negligently sunk vessel to remove it from navigable waters. (3) In *Metropolitan,* the District of Columbia sought recovery of costs incurred in paying a third party to do paving work that the obligor was required to do under the District's charter. (4) In *Milford,* the town sought recovery (from the State) of expenses incurred in the support of a state pauper. Other cases relied upon deal with (a) private litigation for the recovery of statutorily authorized fees (*Harris v. Christian,* 10 Pa. 233 (1849) (an alderman's estate pressed for statutorily authorized fees for services rendered by the decedent); (b) *Steamship Co. v. Joliffe,* 69 U.S. (2 Wall.) 450, 457, 17 L.Ed. 805 (1864) (a pilot, whose services were declined by a shipowner, made a claim prescribed by statute for one-half of the pilotage fees; the transaction between the pilot and the shipowner gave rise to a quasi contract) and (c) a refund of a license fee (*Augner v. Mayor of the City of New York,* 14 App.Div. 461, 26 N.Y.Civ. Pro.Rep. 165, 43 N.Y.S. 803 (1897) (a promise was implied *to refund* a pro rata share of the license fee paid by the plaintiff covering the period during which the government had abrogated his license)).

*Here, the duty is sought to be enforced by the statutory obligee against the statutory obligor, not by a third-party performing the defendant's duty.* Today's reliance on federal and state jurisprudence for imposing quasi-contractual dimensions upon explicit, direct and unequivocal revaluation liability is without any legal warrant or precedent. *Moreover, federal courts have no role in shaping the general body of the common law. Erie v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

**41.** *Mercury Investment Co. v. F.W. Woolworth Co.,* Okl., 706 P.2d 523, 529–530, n. 14 (1985); *Cameron & Henderson v. Franks,* 199 Okl. 143, 184 P.2d 965, 972 (1947).

**42.** In *Anderson v. Copeland,* Okl., 378 P.2d 1006, 1007 (1963), the court, quoting from *Piggee v. Mercy Hospital,* 199 Okl. 411, 186 P.2d 817, 818 (1947), states: "'Contracts implied by law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the parties bound, on the ground that they are

## VI

### UNWARRANTED JUDICIAL EXONERATION OF DERELICT SCHOOL DISTRICT OFFICIALS—WHO VIOLATE THEIR SOLEMN DUTY TO INCLUDE THE REVALUATION OBLIGATION IN THE ANNUAL BUDGET—FROM AMENABILITY TO CIVIL LIABILITY

#### A.

#### Civil Liability Provisions of The Ad Valorem Tax Code

By stripping the county government of all civil remedies (for recovering unbudgeted revaluation costs) against recalcitrant school district officials, the court's analysis leaves the state and counties with no legal choice but that which was doubtless intended by the legislature to be the very last resort—the draconian[43] penalty provisions of the Ad Valorem Tax Code (68 O.S.1991 § 2943).[44]

The Assessor's mandamus petition initially pressed for imposition of the § 2943 penalty provision. She appears to have abandoned that quest when she was later met with the school district officials' challenge to the statute as applicable only to county and state officers.

## B.

#### All Ad Valorem Tax Recipients Are Impliedly Included Within The § 2943 Penalty Provisions

Because, when the revaluation obligation is unbudgeted, the court leaves the county without any effective remedy at the post-fiscal-year stage, I desire to provide the assessors today with that analysis and guidance which will assist them in enforcing the penalties against recalcitrant school district officials.

Initially, the § 2943 penalty provisions may have targeted only county officials.[45] When the statutory scheme was later expanded by imposition of a duty on ad valorem tax recipients other than the county offices to reimburse the county for their share of the revaluation cost, *noncounty officials* automatically came under the aegis of the statute. Insofar as these local officials (other than those of the county) are called upon to discharge duties connected with the revaluation regime, their noncompliance with pertinent statutory commands clearly falls under the purview of § 2943 penalty provisions.

Inasmuch as I would include the school district officials within the ambit of § 2943 and apply the *Muskogee* analysis to solving the instant controversy, I would not permit the statute's penalty provisions to be invoked

---

dictated by reason and justice, and may be enforced by an action *ex contractu.'* "

**43.** The term "draconian" owes its origin to Draco, an Athenian lawgiver, who in 621 B.C. would impose decapitation as a fit punishment for stealing cabbage. *Burton v. Planning Commission of the Town of Redding*, 209 Conn. 609, 553 A.2d 161, 165 (1989).

**44.** The terms of 68 O.S.1991 § 2943 (eff. January 1, 1992) are:
"The provisions of the Ad Valorem Tax Code relating to the *duties of various officials, and the time within which such duties shall be performed*, are hereby declared to be mandatory; and the *failure of any such official, board or commission*, to perform the duties prescribed herein, within the time specified, *shall subject them to removal from office for neglect of duty;* and they *shall receive no remuneration, compensation or salary* for their services, after the time herein fixed for the performance of such duties and until the same shall have

been completed or performed. *Each of them shall also be subject to a penalty of Five Dollars ($5.00) per day* for each day's delay for such neglect or failure; and it shall be the duty of the district attorney as to county officers, and the Attorney General as to state officers, to institute proper action to collect any such penalty; provided, that the validity of any assessment or levy shall not be affected because of any insufficiency, informality or delay in the performance of any duty imposed upon any official, board or commission." (Emphasis added.)

**45.** The legislature first enacted the penalty provisions in 1933 (now codified in 68 O.S.1991 § 2943, *supra* note 44) as a part of a comprehensive act relating to the assessment and equalization of property for ad valorem taxation. Okl. Sess.L.1933, Ch. 115, p. 251, § 13. The 1941, 1961, 1965, 1981 and 1988 amendments did not substantially change the 1933 text. The visual inspection regime, which imposes the revaluation obligation on recipients of ad valorem tax

except only after a judicial finding that the official dereliction (or nonfeasance) was inexcusable.

### C.

***Regardless of Whether the § 2943 Penalty Provisions or the Common Law Applies to the School District Officials' liability For Failure to Include Revaluation Costs In their Budgets, Today's Opinion Leaves School District Wrongdoers Absolved of Any Civil Liability***

By her abandonment of the issue the assessor seemingly concedes the § 2943 penalty provisions are not applicable to the school districts. Whether these provisions or the common law [46] should govern, the school district officials' liability for their dereliction of duty stands eliminated as an issue by the court's unwarranted cavalier exoneration of all school districts of any responsibility for *failing timely to submit the revaluation obligation for inclusion in the annual budget.* Today's opinion clearly sets a course that will enable offending school district officials to violate their statute-imposed duty with utter impunity.

### VII

**THE PROSPECTIVE REACH OF TODAY'S PRONOUNCEMENT CASTS AN UNWARRANTED CONSTITUTIONAL CLOUD ON RECENT *POST–MUSKOGEE* AMENDMENTS IN UTTER DISREGARD OF THE PRUDENTIAL RULE OF STRICT NECESSITY**

The legislature carried into statutory form the *Muskogee*-prescribed enforcement re-

gime shortly after the case was handed down by this court.[47] Under the statutory scheme now in force, when there is an *absence* of appropriated funds, sinking funds *are* to be impressed *with a charge for payment* of an adjudicated revaluation obligation. The pertinent terms of 68 O.S.Supp.1994 § 2823(C) provide:

"* * * In the case of a sinking fund of a recipient, if, after approving its budget, the governing body of a recipient notifies the board in writing that there are no funds appropriated to pay the amount of the billing statement for such sinking fund, *such notice shall constitute conclusive evidence of a financial obligation of the recipient as it relates to such sinking fund. The board may seek a judgment for the amount of such obligation....*" (Emphasis added.)

The court's opinion would *trump* the cited legislation by an out-of-hand *ukase*[48] of invalidity passed in *advance of* a lively and justiciable controversy over the amended act's conformity to our fundamental law. Today's pronouncement clearly violates the prudential bar of restraint[49] by casting a serious and unwarranted doubt on the constitutional validity of post-*Muskogee* legislation. Constitutional clouds must not be injected in advance of strict necessity. When, as here, the legal relief sought may be afforded upon *alternate* grounds, the consideration of fundamental-law challenges is inappropriate under the judiciary's self-erected and time-honored "prudential bar" of restraint.

---

revenue, came much later to Oklahoma law. See Okl.Sess.L.1967, Ch. 359, § 4.

**46.** *See, e.g., Hazlett v. Board of County Commissioners*, 168 Okl. 290, 32 P.2d 940 (syl. 4) (1934).

**47.** 68 O.S.Supp.1994 § 2823(C).

**48.** *"Ukase"* is a "decree or edict, having the force of law, issued by the Russian emperor or government." The Oxford English Dictionary, vol. 18, p. 811 (2d ed. 1989). *See State v. Lynch*, Okl., 796 P.2d 1150, 1166 (1990) (Opala, V.C.J., concurring in part and dissenting in part); *Tedford v. Divine*, Okl., 734 P.2d 283, 285 (1987); *American Bank of Commerce v. Chavis*, Okl., 651 P.2d 1321, 1324 (1982); *Olinghouse v. Oling-*

*house*, Okl., 265 P.2d 711, 715 (1954) (Halley, C.J., dissenting).

**49.** The prudential rule of strict necessity is adhered to today by *all* state and federal courts. *In re Initiative Petition No. 347 State Question No. 639*, 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.*, Okl., 732 P.2d 466, 467 n. 3 (1987); *I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). *See also Schwartz v. Diehl*, Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State Department of Public Safety*, Okl., 543 P.2d 563, 564 (1975).

## VIII

## SUMMARY

*The revaluation obligation is not a debt.* It is an explicit law-imposed command that creates a duty to pay. Its terms are enforceable *sans* implied-in-law promise. There is no statutory or jurisprudential warrant for transforming the statutory mandate into an implied-in-law promise that is made subject to the axe of Art. 10, § 26, Okl. Const. Today's abandonment of the *Muskogee* collection method in favor of a quasi-contractual solution impermissibly exonerates school districts as well as their offending officials of any *duty to tender the revaluation obligation* for inclusion in the district's annual budget and of any *responsibility* for their non-, mis- or malperformance for which they should be made civilly accountable.

There is no need for the opinion's prospective reach. *All that is required today is to decide the school districts' liability in this case.* The prudential bar of restraint militates against gratuitously casting a constitutional cloud on the *post-Muskogee* legislative enactments which *contemplate payment of delinquent unbudgeted revaluation costs from sinking funds.*

I would reaffirm all of *Muskogee's* school-district liability teachings *and* make offending school district officials liable for failure timely to tender the revaluation obligation for inclusion in the annual budget. For *their* dereliction of that duty I would impose the very same penalty as that which applies to county officials under the provisions of § 2943.